The court will proceed to the second case of the day, Mulvania v. Rock Island County Sheriff. Mr. Flaxman. May it please the court. This case is about intake policies at the Rock Island County Jail. First, I'll address the application of those policies to the plaintiff, Joan Mulvania. Ms. Mulvania is a disabled veteran who suffers PTSD as a result of a sexual assault. She was arrested in her home on a domestic violence charge on November 7, 2010. During her transfer to the jail and her intake at the jail, she was having a PTSD flashback. She was acting erratically and she was in severe emotional distress. That is, her disability was manifesting itself. Title II of the ADA requires public entities to make reasonable modifications to accommodate an individual with a disability. Rock Island doesn't do that. For their intake policy, they have a blanket rule that every arrestee who arrives at the jail must change into a jail uniform. And the evidence from testimony of COs, of correctional officers at the jail, is that they implement that policy by using force. That if someone comes in and doesn't want to change into a jail uniform, they use force to force them to get into a jail uniform. That's what they did to Ms. Mulvania, and that's the core of her claim about being forced to change into a jail uniform. Isn't the problem, though, that claim didn't really surface until about four years into the litigation? I disagree that every complaint, an amended complaint filed, was about the jail's intake policies and changing into a uniform. When did you first raise the Americans with Disabilities Act? So that's correct. The plaintiffs didn't give notice of the ADA claim until filing the proposed fourth amended complaint. Which was how many years into the litigation? Well, it was four years into the litigation, but that doesn't take into account that a lot of time was spent on class issues, and discovery into the individual claims didn't really get started until around that time. That the proposed fourth amended complaint was filed within the court's schedule for filing an amended complaint. That was an agreed schedule by the parties, and it was also filed when there was seven and a half months remaining for discovery. The other point that we rely on is that raising the ADA wasn't strictly necessary in the complaint. There's cases in the Supreme Court. It's not necessary in the complaint, but at some point, we've said that basically at some point well into a litigation, the court and the parties are entitled to know what the theories are. And this seems to have been a pretty dramatic shift in legal position from the excessive force claims that dominated the early years. Well, I agree with the premise that at some point, the plaintiff does have to come forward with legal theories, and that might be in a motion to dismiss. That might be in contention interrogatories. We didn't have anything here where it was a waiver of the legal theories. The case we point to for that is King v. Kramer, where after remand, the plaintiff determined that, oh, this shouldn't go forward on the 14th Amendment. This should go forward on the Fourth Amendment. And that was a case where there had already been summary judgment. There had been an appeal and a remand and a case of being ready for trial. Here's a case where there's seven and a half months of discovery remaining when plaintiffs give notice of this legal theory, which, as we keep saying, didn't need to be pleaded in the complaint. It's important to understand the context of filing of the amended complaint, that plaintiff, once discovery got started on the individual complaints after the class claims were out of the case, plaintiff took the depositions of the guards, the defendants took the depositions of the plaintiff, and the plaintiff determined that based on the guard's testimony, they would likely win on qualified immunity. And that's why plaintiff filed this proposed amended complaint, to refine the official capacity claim against the jail for those policies and to drop the individual defendants. In addition to this argument that we're making about the need, about no requirement to put the legal theory in the complaint, we also have the relation back. And that there's no dispute that the complaint has always been about plaintiff's intake into the jail. And she's always been complaining about the same conduct, transaction, or occurrence. In this court's opinion, recent opinion in Nieta v. Chicago, it held that searches that hadn't been in the original complaint related back because the original allegation was sufficient to put defendants on notice. They would have to defend against all claims arising out of the encounter. The district court relied on cases, a case called Johnson v. Methodist Medical Center, and there are these other cases, which I think Judge Hamilton, you were referring to before, where the court is very skeptical of at the last minute. The plaintiff wants to put in new facts, wants to raise a new claim. And as I've been saying, this wasn't the last minute. This was on the court's schedule, and this was with seven and a half months of discovery remaining. Do you agree that our standard of review on that question is abuse of discretion? I agree that a motion to amend is reviewed under abuse of discretion. It's our contention that the way the court applied relation back and the way that the court applied a requirement of pleading legal theories were legal error, that because the district court erred in the standard that it applied, there's no doubt that it's abuse of discretion. The other part of the plaintiff's claims about her intake were the Fourth Amendment claims. And as the plaintiff explained in the brief, this claim also related back to the previous complaints, which always said that the individual guards were implementing the sheriff's policy. That's something that was in the Third Amendment complaint. It's something that the defendant that's left in the case, the sheriff, answered and denied. The district court's first made a ruling that Plaintiff Melania's claim against the sheriff did not relate back. For the same reasons we've been discussing, we argue that the claim did relate back, that it was the same claim that had always been in the complaint. The district court's second ruling was that, based on the testimony of the sheriff, the policy is actually to only use as much force as necessary. And that's contradicted by the testimony of the guards, who Officer Bailey said, when somebody refuses to remove their clothes, we have to take them away. Officer Nestler testified, we just take them off. And there's no dispute that the guards, in using force to remove Ms. Melania's clothing, were following standard practice. The district court noted that this is such a standard practice in the jail, it has a name, and it's called supermanning, that when the guards hold a detainee's arms in front of her head to rip off her clothing, they say that they're supermanning the detainee to get her to comply, to remove her clothing, and give her the jail clothing. The district court had some other bases for argument that we contend were not in the defendant's briefs, that they didn't argue that the plaintiff hadn't alleged or hadn't testified that she was subjected to in a reasonable amount of force. All they argued was that the claim was untimely and that the policy only allows for reasonable use of force. So to the extent there were these other factual issues that the district court faulted the plaintiffs for failing to come forward with, they hadn't been placed at issue. The plaintiff didn't have notice that she would have to come forward with those. Mr. Flaxman, you mentioned seven more months of discovery. Yes, that's right. But all the principles had been deposed by then. Were they going to be redeposed, the individuals who had already been deposed? Well, I think that's a better question for the defendant, who argued that the amendment would prejudice them because they would have to take more discovery. From the plaintiff's point of view, we had all the discovery we needed about the events surrounding Ms. Mulvaney's entry into the jail. So the defendant has contended that the amendment came too late and it was unfair to them because they would have to take more discovery. I don't think they've ever explained what that extra discovery is or why seven and a half months wasn't sufficient to complete that discovery. So from your position, you did not need more discovery? I believe that to make our ADA claim, we may have wanted an expert. And I think that seven and a half months— Well, that ADA claim would have required a further deposition of people already deposed, right? From our point of view, no. From our point of view, we had the testimony of all of the facts surrounding Ms. Mulvaney's entry into the jail. It's certainly possible— So that I understand. So under the ADA claim, which I understand would relate back to the November 12, 2012, who would you be deposing on the ADA claim? Well, the plaintiff did not need any further factual discovery on the ADA claim. It's certainly possible that in response to an expert or in response to— had the court granted the motion a week or two weeks after it was filed, the defendants would have come forward with more evidence about their compliance with the ADA, and that would have required more discovery, but that's all hypothetical. They've never told us what that is. I don't know what that is. Those are just guesses from regular discovery in cases. So as far as I know, there was plenty of time, seven and a half months, and I certainly haven't heard an argument against that. Moving to the—moving from Ms. Mulvaney's claims about intake, the other claims— Sorry, just one last question. Yeah, of course. Is your position on the merits that the ADA would forbid the jail from requiring her to change clothes? No. The ADA does not forbid a jail policy about changing into uniforms, either. That's the Constitution. And from enforcing such a policy? Our claim is that the ADA requires a modification to that policy for somebody like the plaintiff whose disability is manifesting itself in acting erratically and having this PTSD flashback. What sort of modification? The modification would be a mental health screening before this use of excessive force to put her into the jail uniform. And so it finds that she's unwilling because of a mental issue, a mental health issue, to comply with the policy. So what happens next? Appropriate action to deal with somebody who's having a PTSD flashback. If somebody's having a PTSD flashback, somebody's having a seizure, the appropriate action isn't to rip their clothes off. The ADA requires something different than using excessive force, that there's medical care. Force. Or using force. Yes, you're right. You don't have to agree that it's excessive force to say that the ADA requires some sort of assessment before applying this policy. I'll briefly address the underwear claim. You're in your rebuttal time, but go ahead. OK. And what I'll briefly say is just that there's an important concession by the defendants on this white underwear. No underwear that they made pure legal arguments on summary judgment. So that the district court's requirement or expectation that plaintiff would come forward with facts to rebut issues that the district court put in issue was not properly before the court. That plaintiffs didn't have notice that these facts were going to be a part of the court's ruling because the defendant relied purely on legal argument. And the legal argument that we put forward is dignity, that under the Fourth Amendment, recognized in the Supreme Court's cases of Schmerber and Skinner, that requiring arrestees to put out underwear as part of their detention contravenes the Fourth Amendment. There's also this issue of class certification. I'm happy to rely on the brief there. Defendants have refused to respond to those arguments. If there are no other questions right now. Very quickly on the class issue. Your argument, as I understand it, on numerosity requires that the statute of limitations be told for potential class members starting long before any class allegations were made. Is that right? On the theory that the class allegations relate back to the original non-class point. Is there any precedent for that? I think this court's opinion in Areola v. Godinez recognizes that kind of relation back. I'm sorry? Areola v. Godinez is the name of this court's case. It's not something that we raised. I don't know if it's something we raised in the brief. What I'll say about the numerosity issue is that in a lot of cases, the first class motion gets denied and there's another one. In this one, the court's ruling was that there are individual damages, therefore there can't be a class. So there was no reason to come back. That's clearly wrong. But the relation back and numerosity are a problem. In your rebuttal, perhaps you could identify that case you're relying upon that's not in your briefs? Sure. Thank you. Thank you, Mr. Claxton. Ms. Weller? Thank you. Good morning. May it please the court. Heidi Weller on behalf of the Sheriff of Rock Island County. Culminating today is in excess of six years of litigation between plaintiff Joan Mulvaney and the Sheriff of Rock Island County. Litigation that began in November of 2010 with the filing of plaintiff's initial complaint. Now, this litigation has been the very definition of a moving target, including at various times claims that Ms. Mulvaney was held in excess of 48 hours without a probable cause determination, allegations that Ms. Mulvaney was strip searched, that she was held for hours after a judge released her. But what has remained the same throughout this litigation, what has been consistent through the multitude of attempts to refine this litigation, again we are at the stage of a fourth amended complaint, was a claim regarding excessive force specifically related and pled with incredible specificity that Ms. Mulvaney was the victim of a sexual assault perpetrated by male correctional officers, not until the plaintiff's fourth amended complaint filed four and a half years later has it been alleged that this sexual assault which had been previously pled again with enormous specificity, including an allegation that there was medical evidence to corroborate this, not until the filing of the fourth amended complaint four and a half years after the inception of this litigation is defendant to learn that plaintiff's theory is now not that a sexual assault had taken place, but in fact the opposite, that plaintiff wants to raise a mental health issue including that she has post-traumatic stress disorder and that she merely perceived a sexual assault and was having a flashback. Plaintiff's fourth amended complaint sought to allege an ADA claim challenging the mental health screening procedures at the Rock Island County Jail and District Judge Darrow declined to allow this amendment, finding that it did not under 15c relate back. Judge Darrow then granted defendant's motion for summary judgment on the remaining issues. Now it's well settled that a district court may deny a motion to amend where there are among other factors undue delay, repeated failure to cure a prior deficiency or undue prejudice to the opposing party and that comes from the Johnson versus Methodist Medical Center case. I would argue that all three of those factors apply in this case. So for example, we have five attempts at a complaint. The previous attempts had not cured what plaintiff considered a deficiency. Counsel for plaintiff indicates that we have not specified who we would need to depose or what prejudice we might suffer, so I'll take a moment to do that here. We would need to redepose the plaintiff herself. We would need to redepose anybody coming into contact with her, probably including the arresting police officers. The Rock Island County Jail contracts with an outside provider to provide mental health services. This amendment might lead to us needing to join an additional party to this litigation. Certainly we would not have been in a position to depose any treating physicians, physicians that arrived at this post-traumatic stress disorder diagnosis of the defendant. So her diagnosing physician, perhaps a treating physician, perhaps an expert in post-traumatic stress disorder. And I would note that while plaintiff indicates that he filed the amendment within the time frame, it was, in fact, on the eve, the very deadline of filing amendments, and that this amendment does not clarify a position. It really alleges a brand-new lawsuit. I believe that plaintiff's reliance on the Nieta case, this court's recent decision, is somewhat insufficient. And I would say that with respect to the Nieta case, which was decided at the 12B6 stage, what's distinguishing about the case at hand are a couple things. First of all, at the 12B6 stage, the Nieta case was dismissed without prejudice, so certainly defendants in that case could have contemplated a refiling. Second of all, there had not been the protracted years of discovery that we had been through in this particular case. And also what I think is compelling is the fact that the facts alleged in the initial complaint in Nieta do deal with searches, specifically searches of a person and searches of a vehicle. The defendant in that case, the law enforcement agency, would have been in control of the records related to their interaction with plaintiff Nieta. So in other words, could have been put on notice that there was a search of a vehicle in addition to a search of a business or search of a person. In this particular case, the additional facts that are being brought in here are solely within the care, custody, and control of the plaintiff. There is no way defendants would have been on notice of her mental health diagnosis, of her manifestations of this mental health diagnosis. Those would have been solely within plaintiff Moldania's care and control. And while plaintiff contends in the brief that the sheriff does not dispute that plaintiff suffers from PTSD or that she was having a flashback incident, the fact is that in the answer to the Fourth Amended Complaint, those allegations were neither admitted or denied. I would also distinguish the King v. Kramer case. In that particular case, the facts, again, were known to both parties. So in other words, the fact that the plaintiff, Kramer, was a pretrial detainee did not take anybody in that case at surprise. Rather, it was changing the legal standard in a way that nobody was surprised by, taken aback by. In contrast, Johnson v. Methodist Medical Center, the case relied on by defendants, this court noted that the preceding complaints made very specific allegations of medical malpractice and that it was not unreasonable for the defendants to have been taken by surprise in that particular case. The court also noted in Johnson that the parties would have to engage in substantial additional discovery and engage in litigation on an entirely new claim, not a new theory, but a new claim, four years in that case after the litigation had begun. Ms. Weller, can I ask you about the white underwear or no underwear policy? Certainly. Just a few factual questions. I don't know if these are covered by the record, but do jail detainees wear jail uniforms to court for initial appearances? They do. And the district judge seemed to find as an undisputed fact that nobody could be harmed by this policy for more than one day. Is there any evidence that backs up that finding? Let alone making it undisputed? The deposition of Sheriff Jeff Boyd, which was attached to our motion for summary judgment, indicates that there's a variety of ways that an individual in the custody of the Rock Island County Jail could get white underwear. They can make a phone call. The jail allows that to have a family or friend come and bring them acceptable underwear. They have a kiosk system up on the blocks that is also in the deposition where they can order acceptable underwear. So I believe there's some evidence in the record. In some ways, but somebody may not have money, may not have friends, may not have family, right? That's correct. That's correct. And I believe it would be the plaintiff, in this case, the plaintiff's obligation to bring forth some facts to show that they were deprived of underwear for something more than a metaphysical moment. How much does the jail charge in the commissary? I don't know. Is it like pricing for jail phone calls? No. Why do you say that? Because I've seen the we contract with an outside service provider, and I have looked through the items that we provide, and there was nothing that struck me like the costs associated with jail phone calls. Okay. None of that's in the record. None of that is in the record, no. Okay. And could, as a matter of constitutional law, do you think the jail could decide that in secure areas of the jail, detainees were not allowed to wear any clothes at all? No, I don't believe so. Why not? I believe that even our inmates that are suicidal, so is that cannot have a standard jail-issued uniform because of the threat to themselves, are still given a covering of some sort. What's the constitutional basis for that? I don't know. Something to do with dignity. I would imagine, yes. In several relevant amendments. Okay. One of the things that I guess I found most concerning here on this subject is that one other question, does the same policy apply in the men's part of the jail? Yes. Okay. So you could have somebody who's sick, who's got intestinal problems, a woman who's having her period, et cetera, being brought into court in soil jail uniforms, no underwear, right? I would not say that they would be brought into court in soil jail uniforms, no. Why not? One of the things that is addressed in Jeffrey Boyd's deposition is that inmates are given a hygiene kit, all inmates are, when they're brought into the Rock Island County Jail, that includes feminine hygiene products for female detainees. Obviously not for male detainees, but they are given soap and toothpaste and a toothbrush, so on and so forth. So, no, I don't believe that there would be an issue of soiled garments. The jail also has a medical staff present during the first and second shift, so I imagine any medical needs would be seen to by the medical personnel. One of the things that concerns me from the argument in your brief is that we're told this is an important policy in order to prevent this private tattoo ink from being developed, right? That's correct. That's what somebody told Sheriff Boyd many years ago, right? Again, in looking at Sheriff Boyd's deposition, he indicated that he rewrote a 20-year-old jail policy and procedure manual. I reread the deposition. He indicates that he spoke with former jail administrator Steve Dean. He also indicated that he consulted with the American Correctional Association guidelines and sought out guidelines from other accredited facilities. So if you read the deposition as a whole, I'm not sure where specifically in looking at all of those things that he used to put together the jail policy and procedure manual that the tattoo ink came from. Well, the concern I have is that the evidence before us indicates that this policy was not consistently applied. Detainees were often permitted to wear colored underwear or wore it without the knowledge of correction staff. That's from your brief. That's correct. And that's supported by the individual correctional officer's deposition testimony, which was that they would, deposition taken of correctional officer Jody Barton, indicated she would not require pregnant females to remove their underwear. Yes, it was inconsistent. So how important is this policy? I don't know that the sheriff necessarily knew prior to these depositions that it was being applied inconsistently. And if it's not being applied regularly, is there any evidence that the feared tattoos have emerged somehow? There's nothing in the record. So it sounds like the support for this policy, at least to me, this policy that certainly has significant dignity implications for jail detainees is awfully thin. I would contest the assertion that it has significant dignity implications. Oh, you would? I would. In looking at the context of the particular litigants before the court, there has been no attempt by plaintiff to distinguish ones who may have been in a jail uniform without underwear for a matter of minutes because someone was posting bond for them, for a prolonged period of time, which might raise a dignity concern, or for a very brief period of time until they were able to get up to the blocks and order underwear in a kiosk or have a friend or family member bring them. I do believe that a brief period of detention without undergarments, and again some of these women were brought into the Rock Island County Jail not wearing undergarments at all, so to argue that it was a particular affront to their dignity. Presumably their arrests were unexpected by them, right? Presumably. But to say that it was a particular affront to their dignity to be maintained in clothing without underwear is undercut to some extent by the fact that they arrived without underwear to begin with. Certainly we've all been in a context of a medical provider. There are moments when we as humans don't give up our dignity, but nevertheless have a brief moment of disrobing or being present in a situation without our undergarments on. Jail is a little different though. I don't know that it is. How so? You don't think there's a difference between voluntarily going in to see a doctor and going through a jail intake process with multiple guards around you? I don't know that applied to these particular litigants that there would have been multiple guards. I think that the facts would show that most of these women didn't change in front of anybody. If they were cooperative, they were allowed to disrobe behind closed doors. And if we're talking about dignity concerns merely by being in a situation where they had a clothing garment touching their skin, that they didn't have an undergarment protective layer, I guess, between them, then I do not see the distinction between a medical context or a brief amount of detention. Certainly we all use towels at hotels, and there are various things that we do in our day-to-day lives that don't impinge our dignity. But I see that my time has run. Are there any further questions? If not, I would thank you for your time. All right. Thank you, Ms. Willer. Mr. Flaxman. I think I am out of time, but I did want to respond to Judge Hamilton who asked me for the site. The case is called Areola v. Godinez, A-R-R-E-O-L-A. I believe it's a 2008 case, and I don't have the exact site, but I can file a 28-day letter later today that provides the court with a citation to that case. The only other issue that I want to address was just the statements by defense counsel about what extra discovery they would need. I don't think any of that would take more than the seven and a half months that were remaining. The other issue is that the plaintiff was asked about her PTSD and her deposition. She also had disclosed her doctors, and those depositions had been scheduled but didn't go forward after the amendment. Unless there are other questions, we will move on. Thank you, Mr. Flaxman. Thank you. Thanks to all counsel. The case is taken under advisement, and the court will proceed to the hearing.